At this time, would Attorney Vecchione please come to the podium and introduce himself on the record to begin? Good morning. Good morning. Please the Court. I'm John Vecchione of the New Civil Liberties Alliance, representing Appellants Relentless Inc., Huntress Inc., Seafreeze Fleet, LLC. With me, by the Court's permission, is Megan Lapp of Seafreeze in the gallery. Thank you for that courtesy. I'd like to reserve three minutes for rebuttal. Yes. There are two main overarching arguments here for the appellants. First is that there is no such thing as an at-sea monitor in the statute. There's no support for at-sea monitors paid for by the industry in the statute. And I'll go into each reason why that's true, but in contrast to Loper Bright, where they just assumed at-sea monitors were observers, and you'll see that in the opinion, here we have the argument that at-sea monitors themselves are something different, something that Loper Bright didn't go into at all. And the second thing we have that's unique to this case is that my clients from Rhode Island have a type of phishing that has been disregarded by the agency. And so you have an arbitrary and capricious argument. You didn't have any pay claim, you didn't have an Loper Bright. But what I think that, pardon me, I have to put on these to read my notes. So here, these at-sea monitors are not mentioned, as I said, Congress didn't know anything about them. There are 120 observers that Congress knows all about, and Congress funds them every year. And they have different duties than at-sea monitors do. For instance, they have to have college degrees, they have to have certain scientific degrees, they have to have biological knowledge that these at-sea monitors don't have to have at all. It's a different office. Counsel, can I? Obviously, you should argue this as you wish, but I would like you to address a question that is a concern to me. You acknowledge, I gather, that the Magnuson-Stevens Act, I mean, it does contemplate delegation, right, to the Department of Commerce and to NOAA and to the National Marine Fisheries. So delegation is embedded in the law. Would you agree with that? For some things. Not for creating a new office and funding it by... So for, yes. Okay, so... For some things, yes. Okay, so I realize I'm jumping to the Chevron issue. So how would you articulate the Chevron deference question? How do you understand that question, given the fact that delegation is embedded in the act? That seems to be undisputed, that delegation is contemplated. So how do you articulate the Chevron question here? First, there has to be ambiguity, and we should not manufacture ambiguity, all right? So under Chevron, if the statute is unambiguous, that's it. And here, if we use statutory construction, there's no ambiguity. These new offices aren't allowed. But the other aspect of it is, and here's what I think is in the back of court's mind and the concurrence in GAEFL is what's getting me here. One reason we know that this is not regular regulation, delegated regulation, is that I have to... A candor with the court, I have been involved in every one of these cases. I was president and CEO of Cause of Action when we took the GAEFL, when the GAEFL case came down. I was also with that non-profit when we took the Loper Bright case pro bono, and we have this case pro bono at the non-profit I'm at now. So I'm no stranger to these. And this delegation issue is, what is actually going on here? It's different from the concurrence in GAEFL. If you look at the citations of the concurrence in GAEFL, neither I nor the largest law firm in the world, the Justice Department, has been able to find in any regulated structure, not EPA. We looked at EPA. We looked at FDA. In FDA, if you want a drug, look at it. You have to pay an enormous fee to the FDA because they have to go do all those things. There is no analog anywhere in regulatory cases whereby the regulated party pays for their monitors without direction from Congress. Nowhere. Can we break that down? Isn't it clear that Congress did expressly authorize the agency to require observers on board? To carry observers, yes. Okay. So since they have that party, that leaves only the question of who pays the observers. Doesn't leave the question. The question not said. The question not answered by Congress, because Congress, don't forget, in all the other parts, it says I think not answered and leaves unanswered sound similar. No, when you don't say, and you may charge, that doesn't create ambiguity. That merely says, what was the issue then? The issue was, at that time, could observers go on these private boats? Congress solved that problem. But how are my clients to know, and this is a matter of democratic responsibility, how are my clients to know when they put that observer requirement in there that they would have to pay for it? You can't create ambiguity from that. Let's stay with that for a second. Aren't there lots of other things that are planned that Congress has authorized the fisheries to do? Yes. They can require that you use a certain type of netting. Yes. And who pays for that netting? We do. That is the type of cost that you put in the concurrence, all right? That is the type of regulatory cost that's in the concurrence. What if I, well, in your concurrence in Gaethel, you cited that we never told the Congress about regulatory burdens. And I am telling you that this is not that kind of regulatory burden. What if they said, I want to put two observers on the boats? We, I'd scream bloody murder, right? But two observers on the boats, if they put their reasons in, what cost do we take? How do you differentiate the cost of the net from the cost of the observer? Because Particularly given the necessary and appropriate. Because the statutory, two reasons, the statutory portions for nets is separate for observers. It says a lot of things about nets, but when it wants observers charged, it says that. It says that collapsed. Does it say that your clients have to pay for the nets? It says that The statute doesn't. Hold it. It says that they have to require the nets and the statute, that portion of the statute says nets and those are traditional regulatory costs. And that's another matter of this. Well, go back to Judge Thompson's question. I'm not hearing how you, Congress has issued a command, an authorization, they can require nets. Doesn't say who pays for the nets. The agency then requires the nets and your clients have to pay. Sounds very similar to saying, Congress, let me just try to finish because that will help you answer, okay? Congress tries, Congress says you can require observers, doesn't say anything about who pays observers and so your guys are left paying for them. Why is that different? It's different because people are different from things and officers of the United States are different from things. But how are they officers of the United States? Well, they're, I mean, federal officers. That's a term of ours. But they're not federal officers. Sure they are. Under the Constitution. No, they're, they are a federal office. They work for the federal government. They report to the federal government. If you stop them in their duties, the federal government punishes you because they're doing a federal job. Who pays them? The observers are paid by the government. The ASMs are paid by us. Okay. It's the ASMs that's at issue here. Yes. And who gives them the W-2? They're employers. We have, we are forced to contract with them and they're employers. Okay. So you pay pursuant to a contract. They're a private entity that employs them. Yes. So how does that make someone a federal officer? Because if you look at what they're doing, they are the monitors for the federal government. They don't do anything for us. They don't do anything for the boats. And that's the difference with nets as well. When you require nets. Well, they ensure that you don't go over your catch limit. That's because the federal government doesn't want us to. They're federal officers. They're doing exactly what the observers do. Suppose they require that you have an electronic camera and computer set up that would monitor all areas of the boat at all times. Well. Who pays for that? Which is an option. We would have, we would have, I'll tell you exactly because I have that case in the Mexican Gulf case that is for Louisiana right now. They originally put in that the boats pay for it. But then NOAA decided that because of the Fourth Amendment, they were going to pay for it. I think because of the Fourth Amendment. So they paid for it. There's a complicated thing there. But they could say that you pay for it. Who would pay for it? I say that they have to pay for it because I believe there's a Fourth Amendment problem in taking the information from that and giving it to the government if you own the device. But nonetheless, they would say, the administration would say that you pay for it. But again. What case? So you're saying the Fourth Amendment wouldn't apply to putting an observer on the boat, but it would apply to putting the camera on the boat? Well, because the information that you're sending to the government, it's tangential to this. For your answer, equipment is different from people and the carrying costs of equipment are known to Congress, right? The carrying costs of officers doing a Federal job, which is what they're doing, and I'll give you an example of this. In the Gaithel case, when you said these were, you know, that the majority should not say anything, the majority said something and Congress says, no, we should be paying for that. And they paid for it. Now, they paid for it through appropriations. But all of the intention of the Madison-Stevenson Act on observers is that Congress says exactly, they wrote down exactly when the industry had to pay for it, exactly. They put it in the statute. They put it in lapse. They put it in the Northern Pacific and they put it for foreign observers. And if you read the foreign, what, where they say that the agency can try to make it. position that there is specification in the statute that for certain fisheries, the industry will have to pay fees to the government to defray the cost of the observers. That's specified at several places. And you say, well, because it's specified in those instances, it's not allowed in other fisheries, whether you characterize it as a fee or a direct payment by the observer. But why, why can't you read that differently? You could, Congress could say, well, we know enough to specify that fees will be collected in these instances. In other fisheries, we'll leave that up to the councils to make, to make the judgment whether in those instances, the industry should also be required to pay for this. Not perhaps through fees, but through some other mechanism. Why, why, why isn't that a reasonable reading of statutory scheme? It's completely unreasonable because of what they did in the, with the foreign fisheries where they make these contracts. And it's completely unreasonable because Congress has only allowed these in the other places because they've spread out the costs. Congress was fair in the other, the Northern Pacific and the lapse by spreading the cost. They never expected that these observers, that they're appropriating money for that little bit of, of language would be made up by the agency after 20 years. Don't forget, this was 1990. It took them 20 years to figure out a way to do this. That's because the statute's clear and it took a lot of work to make it ambiguous. Thank you. At this time, Attorney Mishra, please come to the podium and introduce yourself on the record to begin. Good morning. May it please the Court. Dana Mishra for the United States. This rule serves the interests of fishing communities locally and in this nation by conserving this overfished fishery for everyone's, including these corporate interstate commercial fishing plaintiffs, future use. Counsel, let me, let me say, let me say at the outset that I think the government has a fairly odd view, I suggest, of what, what is an express declaration? By Congress, in this instance of the proposition that the industry should have to pay for observers. I mean, you, you get to this notion of express declaration by winding your way through a whole complex of statutes. You can't, you cannot cite a single statutory provision that supports that proposition. What you do, I'm not faulting you for this kind of analysis, but I do suggest that it does not support the proposition that Congress has expressly dealt with this issue because, again, you have to cite, I don't know, six, seven, eight different statutes, statutory provisions, and then say, there it is. There's the express declaration. I don't, I find that a very odd view. How do you, an odd view of the notion of an express declaration, how do you support that proposition? Sure. So, the support for the plain meaning of the statute authorizing this particular regulation, the aspect of it that's challenged here with respect to the cost-bearing aspect, that's something that follows naturally from, most clearly from the provision, Section 1853 B.8, which we think that all these other provisions of the statute, and there's some others that I can point you to to help support our understanding specifically of that provision, but we believe that all of these others are just reinforcement of the understanding that it's authorized there. Even if it were not, it would be authorized by the necessary and appropriate provisions, and those are reinforcing of the idea that 1853 B.8 does, in fact, authorize that. And the reason for that is because 1853 B.8 requires that observers be carried on vessels doing this data collection. This particular type of conservation... It says nothing about payment, nothing. But that follows from the fact that it authorizes the regulatory requirement to be imposed on those vessels. So, the vessels are going to have a responsibility to ensure that these observers are carried on board to do this data collection. And as a result, they need to ensure that that happens. That means that the costs are borne by them in the first instance, if that's how the regulation chooses to structure it. So, the point is just that at least that is contemplated within the Section 1853 B.8 language and we can point out... I'm sorry. Are you primarily relying on the necessary and appropriate provision for justification of the fee? Who bears the fee? We believe that those are also reinforcing. They would be an independent fount of authority if Section 1853 B.8 were not enough, but we would give you some other reasons why in the text of the statute the plain meaning is such that Section 1853 B.8 contemplates that these costs will be borne by the vessels. And so, one of the... Isn't this... I, too, like Judge Lopez, was somewhat puzzled by the lengthy scheme of argument on the sections in the government's brief. I thought it was simple. I thought Congress says in 1853 B.8 the agency can require observers. It doesn't appropriate any money to pay for observers. It doesn't say anything that suggests that the agency would be paying for them. And if we were to interpret that as saying that it has to pay for them if it's going to require them, then Congress would have done essentially nothing. Right. We agree with that and that's our understanding of 1853 B.8. We think there's other text in addition to the text laid out in the brief that reinforces that. For example, Plaintiff's Counsel has suggested that the provision is just about placing or stationing these observers. That's in direct contrast to the language in 1853 B.8 is in direct contrast to language in 1827 on that dimension. Could you just address Judge Cayatta's simple question that he just presented to you? Why isn't that enough, he's asking? We do believe it's enough. We believe that the plain meaning is reinforced by all these other provisions and that 1853 B.8, as Judge Cayatta has described, carries with it... It contemplates that these costs will be borne by the vessels to... Essentially there is no clear statement rule that vessels would have to have it explicitly spelled out that they'd have to bear the cost of complying with the requirement that is duly authorized. Is there any kind of limitation on what kind of cost can be shifted to the boat owner? There is no limitation in 1853 B.8 in the sense that it does not... It has one exception that does not apply to this kind of context and it's indisputable that it does not apply. It did not create any other exception for the question of whether it's government funded versus vessel funded. What we're saying is that it naturally follows from the requirement to do something that those costs would follow, especially in this context and with respect to this statute, given the many other provisions that make it as a plain text matter very clear that data collection was essential, that this conservation data collection is necessary and appropriate, that contracted for observers were expressly contemplated, for example, by sections 1857 and 1858. And we also think that with respect to suggesting that it's just maybe less than requiring them to have these observers on board, we point to the language in 1853 B.8 which says they have to be carried aboard to do this data collection. And we think that that would also address the argument that was made for the first time in the reply brief that somehow there would be a narrower set of these costs. The costs of doing that data collection are contemplated within the 1853 B.8 requirement. I'd like to ask you about the arbitrary and capricious issue that the opponents raise. If I understand the argument correctly, they're saying that smaller vessels that spend fewer days out at sea can entirely avoid the costs of these observers because they do not pass a certain threshold that triggers a requirement of observers. And their point is that in the aggregate, these smaller vessels end up catching probably more herring than the trawlers that are used by the appellants here. And they're saying that that just makes no sense. If the concern is protecting the herring stock, why would you not want to require those smaller vessels that in the aggregate are going to catch more herring to also be subject to the requirement? It just makes no sense. And your response to that seems to be, well, in any regulatory scheme, there are winners and losers. And in this instance, these big trawlers are losers. And that's just tough. I mean, if I understand your argument, that doesn't seem like really a satisfactory response. Sure. So I think our argument is actually broader than that, Your Honor. And I think the first point we'd make is that they haven't substantiated with any record citation that this is a concern that is actually occurring, that there's actually that kind of action in terms of multiple additional trips being taken. If that were happening, actually, trips are logged when they declare. So the agency would be aware of that and would be able to take the opportunity to make adjustments as necessary as contemplated even by the regulation itself. But more importantly, we've laid out a little bit in the brief, but the determination of it at the trip level is something that makes sense because that's when observers would be able to get on the boat. So the determination is that when you're looking at a particular trip, you're determining whether or not an observer is going to be, it's going to be appropriate to have that at-sea monitoring for that trip. And so when looking at that, the trips that are going to have the capability to take a lot more herring and that are declared to take in excess of 50 metric tons, for example, of herring, as is the case here, that those are the ones that are potentially going to pose more burdens to the fishery in terms of if they were going beyond catch limits. But also, those are where you're going to get a lot of the information, the biologically scientific information to help determine whether there's sufficient stock to sustain this fishery so that everyone can benefit from it going forward. And in addition, I would point out that these particular patients... Can you just better explain that last point? How are they going to get more information? Sure. So the information that comes in from what the observers measure, they measure, for example, length of catch, they can determine whether there's sufficient juvenile stock, that there can be, you know, that there's sufficient stock that there can be reproduction, that there's sufficient stock that there can be rearing of the fish. There's a number of different specific types of things in terms of fish weight and fish length and particular data that help to determine whether there's a stock that's sufficient to... That doesn't explain why smaller boats would be accepted. Right. But the issue is that if smaller boats on an individual trip won't necessarily produce as much of that monitoring information to help calibrate the, for example, the determinations of what catch limits should be. And that's something that's laid out in the regulation as well. So everyone, in a sense, benefits from this information. And this includes these plaintiffs' companies' benefits from this information because there can be better determination about what catch limits should be, you know, and taking stock of whether there's sufficient stock in the sea for sustainability purposes. Why wouldn't it benefit the ultimate objective of preserving the stock, getting a sense of the aggregate of the amount of herring being caught? Why would it advance that goal to have these smaller vessels as well, have these monitors? That's clearly relevant to the ultimate goal of preserving the stock, isn't it? I want to be clear. These aren't necessarily smaller vessels. They may be smaller business entities and they have, you know, other related entities that may have other income elsewhere. But the important point is that the exemption for under 50 metric tons is something that actually helps to accommodate what smaller vessels would be able to do. On an individual trip, a smaller vessel doesn't necessarily have the capacity. And reinforcing that point, we point to, I believe, it's pages 12 to 13 of their brief where they talk about how their even daily holding, daily capacity is in excess of that 50 metric tons. It's over 125,000, it sounded like, or something that is a number that is in excess of 50 metric tons. So it's not even clear that the per day metric actually should make much difference for them. But more importantly, the standard under the National Standards and the Regulatory Flexibility Act precedent in this circuit is that the, especially for the Regulatory Flexibility Act, the agency needs to make a reasonable explanation. And this is a reasonable explanation that was provided in the statute. So it doesn't have to justify de novo that there is, this would be the best alternative. It's even not the case under the case law that it would need to say that a particular alternative that was proffered by particular entities that want particular accommodation for their particular practices would be something that it does or doesn't make sense. My point is mostly that here the agency laid out reasons that are well attuned to the nature of how the observer process works, that are well attuned to trying to conserve the fishery overall in terms of determining which types of trips are, which types of vessel trips are going to end up having the benefit to the fishery that the monitoring regulation is designed for. Counsel, would you, for my benefit, would you, I think I posed this question to opposing counsel and I don't think I got an answer, but I'm hoping you can give me one. How do you articulate the, what's been characterized as the step two question? Let's assume there's ambiguity. Let's assume that we have a situation where silence creates the ambiguity. I know you don't agree with that position, but you do have a fallback position, which is the Chevron analysis. So how do you articulate the step two question? It would be helpful for me to understand exactly what that articulation is. Sure. So we believe that as a matter of plain meaning, these provisions add up. I'm sorry, it's a matter of what? In the first instance, we believe, of course, our primary position is that as a matter of plain meaning, the statute directly is understood. I understand. I understand, Your Honor. What this means, though, is that all of that reasoning comes to bear with respect to the determination of the fact that it is at least reasonable and would survive the Chevron deference step two analysis. And so we believe the Chevron step two deference would be merited here, would be warranted here if the court chose to get to it. But if I may, I'd like to point out one other feature of the text for the court to take into account as it determines, you know, whether it thinks that this is something that could be done as a matter of plain text. Could you just answer that question before you move on to another stage of the test? Sure. I'm sorry, Your Honor. I thought that essentially what I was trying to articulate is that all of the textual arguments that we make with respect to why the plain text should be understood in the way that the United States understands it. The question is assuming we don't agree with you and we find that there's ambiguity, then what? Correct. All of those are reasons why the understanding is at least a permissible or reasonable understanding for Chevron step two deference. So even if there was a question of necessarily of silence and going to Chevron step two, and I will note that the D.C. Circuit chose to proceed to step two, and I think this is clear at page 12 where they talk about how it could have potentially even been a question further at step one because it doesn't have to be compelled. That's a line at page 12, their opinion. But if you go to Chevron step two, all of that plain text comes across and is supportive of the idea that this understanding of the statute is reasonable. And in addition to that, there's, of course, purpose evidence that we've laid out in the brief as well. So all of these other statutes that you cite, even if they don't support the proposition that the statute expressly supports this cost mechanism of paying for the observers, those same statutory provisions serve to establish the reasonableness of the rule. I gather that's your position. And when you say reasonable, you mean it's reasonable to conclude that Congress would say, yes, we think this rule is consistent with what we were trying to accomplish with this legislation? It's reasonable. My point, and I gather the reasonableness is grounded in a judgment that we think this is consistent with congressional intent. Is that how we're supposed to view the reasonableness question? We think the question is whether it is reasonable to understand the statutory authority that is provided in this statute. For example, 1853b8, the necessary and appropriate provisions, data collection as being essential, and this being one of those types of provisions. It's reasonable to understand those as authorizing and contemplating the costs that were expressly contemplated to be borne by vessels with respect to contracting. So that Congress provided for delegation, which they clearly did, this is the kind of rule that they had in mind would be adopted pursuant to that delegation? Is that the way we're supposed to frame the question? The regulation expressly, to your point, the regulation expressly understands the agency's regulation expressly in its promulgation, in its preamble, expressly understood Section 1853b8 to comprehend this authority, to do this thing, essentially to allow costs to be borne by the vessels who are required to do something for which those costs are coming to them. So in that understanding, our point is that at the Chevron Step 2 question, that is a reasonable understanding in light of the extensive statutory text that's laid out in the brief, the purpose evidence, et cetera, and that that should at least survive at Chevron Step 2. But we'd urge this Court to consider whether it's sufficiently clear. And a final question. What is it that ultimately justifies the deference that goes with the Chevron doctrine? What justifies the deference? So this Court has laid out that when there is that kind of expressed delegation, there's contemplation that the agency will have that role because of its expertise, for example, and because of the fact that if there were silence, that it would be appropriate for the agency to fill it because it has some express delegated authority from Congress to make that determination. So Chevron is justified on those types of grounds. But to be clear, of course, Chevron is just binding precedent in this Court. We, of course, would support this Court deciding to apply Chevron deference. We just think that it is also clear at the initial stage in terms of the matter of plain meaning. I have a budgeting question. Suppose we were to hold that the statute does not address and does not authorize having monitors unless the government pays for them. Could the government pay for them as the statute now stands? So, I mean, that, of course, would be an ongoing question with respect to ongoing appropriations. My understanding is that for the coming year, there may not even be industry-funded monitoring to some degree because the administrative costs of the program need to be, even under this regulation, borne by the government, and those administrative costs may not be covered with respect to all fisheries, et cetera. So just as a practical matter, that would, of course, depend on the particular appropriations at different points in time. When Congress appropriates money for the agency, do the line items go down enough to tie the agency's hands such that it could not take money from some other pocket to pay for these endeavors? So if Congress wished to do that, of course Congress is capable of writing an appropriation statute to restrict in that way. That's not been argued in any way here. You know, even other statutory restrictions with respect to appropriations have been affirmatively waived. For example, at Docket Entry 11, page 9 in the District Court, when they were opposing this case being grouped with LOPER and transferred. Could you give us some sense of the magnitude of these observer costs, of the pay to the observers? Sure. So, I mean, the regulation makes clear that the particular cost, the daily cost that was proffered by plaintiff's counsel, is actually a maximum daily estimated cost. That was that 700-something figure, but that's a maximum cost. And importantly, the regulation also pointed out that it's not actually, for example, this 20% figure that's been provided with respect to impact on returns to owner. Let me, maybe I was too broad. If we were to hold the government has to pay for the observers, what would it cost the government? Oh, I don't have that figure directly for you. It is the case that the regulation contemplates that where there is government funding available, that is going towards the SBRM program, it will be encompassed. So you don't know how many observers there are? Well, it varies over time because the government funded observer program, separate funded observer program, SBRM, can take up more or less of it depending on how the funding operates. These observers, the at-sea monitors that we're talking about here. Right. As I mentioned, I'm not sure for this coming year that there will be a requirement for industry-funded monitoring, but that's information that I don't have specifics to that. I'm trying to talk about the year that's at issue here, not what's happening in the future. Well, I think the challenge is to the regulation generally, as I understand it, so I don't think it's specific to the costs that are actually at play. And that's clear because the briefs proffered are only pointing to numbers that are briefed at 54. Footnote 3 explains they're not quite accurate numbers in terms of the record for the cost. I apologize if I'm not understanding you. I don't have specific numbers for this current year for the industry. I'm just trying to get some sense of the economic order of magnitude that we're talking about here. Maybe you can't give any sense. If that's the answer, just say that. But if you could give us some sense, it would be helpful. I don't have that before me today. If it was important to this court, I'd be happy to try to provide that information. Is it in the position of the record anywhere? There are estimates, as I said, of how many... Part of the difficulty is that because of the exemptions, it's not clear how many trips will actually be meriting observers with respect to this program as opposed to, for example, the standard. But if Your Honor would be interested in information about the current costs of the standardized bycatch reporting methodology program, that separate program, I could potentially provide that information later if that would be of reference. I don't think that's what I'm looking for. I'm just trying to get a sense of what the economic order of magnitude is of the issue that is before this court. Right, and I think that the difficulty is that that depends on the... So that with the 50% coverage, because so much of that can be covered to some degree by this other government-funded program, it's difficult. I don't have those specific numbers, and I'm not sure that the record has them. But I'd be happy to go look or to consult with the agency and provide that information if it's helpful. Jay, please.  I was just trying to get some really specific information about the year or so, the period that is before us. It's not that it depends, because this already happens. We're just trying to figure out how much it costs. What's the financial burden that is borne by these private boats? Counsel, I do have a related cost question very quickly. The appellants point out that when the fee mechanism is used to pay for these observers, that the statute places a cap on how much. I think it's 3% of some value. I'm not sure what that is, but they point out, and I think this goes in part to their arbitrariness question, when this model of funding is used, there's no cap at all. And that, obviously, they find problematic. How do you justify the imposition of a cap when one funding mechanism is used, but no cap at all when this mechanism is used, if I understand the situation correctly? Sure. So we'd make a couple of different points. First, as to the magnitude of the cap, I'll just point out that at page 54 in note 3 of our brief when we're discussing the actual costs, the impact of returns to owner, we actually have evidence from this record that it is going to be less than 5%, or maybe even less than 3%, a median of 2.5% on that annual returns to owner figure. So it may actually be that it's in the range of the same range that we're discussing with respect to the LAP program, and that's A566 has that at the bottom, that 2.5% figure. And then in our brief, as I said, 54 note 3 has the citations from the regulation. But even with respect to the cap, just in explaining why Congress did what it did, the LAP program is a very specific type of program. There's individual privileges, there's these quota set-asides, and it made determinations, Congress, that for a particular context, they wanted to adopt this highly reticulated program. Here, though, Congress expressly, in the face of there being industry contracted for monitoring in the North Pacific fishery, decided to adopt a broad authorization in 1853b8 that for domestic fisheries would have the ability to have that requirement to have these observers on board doing that data collection, and it didn't make any specification that that should not exceed. What it did have is that there are these national standards in the statute, and they talk about taking consideration of costs, and they give a very specific mechanism by which that's done, and the court has precedent about how to take account of costs. In particular, it talks about minimizing to the extent practicable, not eliminating, not necessarily picking a firm number, but that is something that is context-dependent, and that's an analysis that's contemplated by the statute that we've laid out in the brief why that is not a problem here because of, for example, essentially like eight different things that the regulation does here to help address costs. Thank you. Thank you, Your Honor. Thank you, Attorney Mishra. At this time, Attorney Vecchione, you can come to the podium and reintroduce yourself on the record. You have a three-minute rebuttal. John Vecchione for the appellate. Judge Lispitz, I'd like to answer your question, which is this. If you get to Chevron Step 2, is our unreasonability argument is that if you're going to throw out the canons about inclusio uno and making certain parts of the MSA superfluous, and all those canons are thrown away, and we say, ah, they said they could be observers, so anyone can pay for them, then you go to Step 2. That's reasonability. It is unreasonable. At least those other parts of the statute give you the thumb of what reason is. It isn't reasonable, like, on a rational basis where they can do anything. Congress has, when it's set up these observers, when they are paid by industry, what reasonable is. And it's 2% in the northern Pacific, and it's 3% in the laps, a cap of the percentage of the value of the fish per ship is how it is. And if you look, as far as the costs go, that is in the record, and that is at AR 17735, it's Volume 85, Fed Reg 7418. And they lay out that it's 20%, and that is unreasonable. As for the appropriations, there are 120 observers. This is on the website. You can go look. The observers are a known group who have these degrees. They're a term of art, in my view, and there are 120, and they're funded by the government every year by Congress. And they say how... I believe it is a line item, to tell you the truth. I don't have the facts in front of me, but they fund them, and that's the reason why the appellees went all over the world trying to figure out how they could manufacture ambiguity here and go get the amount they want. Congress, there's another reason why Congress didn't delegate this power, and that's because who pays is the crown jewel of congressional powers. It's how they control the agency. They look at the CFPB case and how everyone fought about what the funding process was for CFPB, because Congress wouldn't have to ask for funds and all that. How Congress pays for things is how they control the agencies. It's how they exercise their Article I powers. And if by simply saying there will be monitors, they say that for the FDA. They say that in meatpacking. They say that in a lot of different statutes, and only the fishermen of New England have ever had to suffer this. Because the Northern Pacific, they put in a statute. Because Congress was involved, they made it fair. And the Northern Pacific is not a beleaguered fishing sector like this. It's the richest fishing sector in the North America, maybe in the world. And they set that process up for the biggest guys with the most money. And that's a reality that I think even we should bring into the appellate court. This idea that they left all these other fisheries to bear all these costs when they were so gentle with the richest fishery in America is unreasonable. It's an unreasonable interpretation of the statute and the facts. How are you saying they're gentle and they have to pay the observer costs plus they have to pay the agency's administrative costs subject to the cap? Because it's spread amongst the whole fleet. There's no, you know, I'm putting my observers on your boat all the time because you've got a big boat and there's another thing that's going on here is that the ASMs, which are different from observers, they have to have a certain amount of sea time. So they like being signed to our boats and they try to get, I think they try to get on our boats because they can get more sea time rather than, you know, four or five days trips. So it's spread amongst the fleet and same with the laps. If you have an observer and this is why the majority in D.C. was completely wrong about the laps. If you look at page seven and eight of our reply, you'll see that the Northern Pacific observers are a one-to-one match to the laps. And you see that in page seven, eight, and nine in our reply. So in the laps, how it works, we've got two of them here in New England. And when the observers that can be paid for with a three percent cap are put on your boat, you get a higher quota of the tilefish or the other fish that the laps are. That's how it works. Only here when the agency is given this power are the costs so high and the cost       and the protections of the fishermen with, I'd say, disregard of the national standards. Counsel, in your reply brief, you say that the fishermen regard these observers as nuisances. That's your very word. Yes. And that they don't do anything for the fishermen. I mean, that sort of betrays an attitude towards this whole scheme that suggests that your clients don't have any state    in the ultimate quality health of the fishery. I mean, the whole premise of this is that everybody's got a stake in this and because everybody's got a stake in it, everybody's got to share the burden. I mean, your notion is, I'm sure, the fishermen would probably prefer to live in an unregulated environment where they can continue to do what they've done perhaps for years. But the premise of the act is that    for the health of the industry, for everybody's sake who depends on economically, everybody's got to share the burden. Why isn't that a sensible view of what's going on here? I agree with that. My clients consider them a nuisance, but they think the observers should be on the boats, the observers the government pays for. Judge Lippis, I don't want to get a wrong view of this. What I'm saying is that there's a certain culture  class that's looked upon as a nuisance, but nobody opposed the observer. None of my clients or anyone I know opposed when the government came in in 1990 and said there shall be observers on the boats. Nobody opposed it. They knew. Nobody wants there to be fish in the sea more than the people I've represented all over the place in many of the fisheries of America. That's why they don't oppose these statutes. What they oppose is that suddenly they look at the observer on our boats. That's the way it goes. Nobody opposed it for the reasons you just said. They all agree with that. The idea that they think they're a nuisance doesn't mean they don't think they should be on the boats, but if you're just a fisherman out here in  I walk along Fan Pier and I see all the history of it, and you can't spend a lot of time reading statutes. You have your guy read the position, but then the agency comes along and says, well, you didn't oppose putting observers on your boat, and now we're going to say, hey, we can charge you whenever we want because we're going to manufacture ambiguity. It is a matter, as I said before, of democratic accountability. All of my clients and all the fishermen know that everyone's got to count the fish in the sea. And that's why we have berths, right? We make room for these guys. We bring them on our boats every time. We don't make a  We've never kicked about any of it. But it's when the agencies come and say, now we're going to create a new guy, ASMRs. They're not even these observers with all these abilities. We're going to put them on your boat and make you pay for it. Where's that in the statute? It's not. So... Based upon what you just said, I'm back to not understanding the difference between having you bear the cost of a net and having you bear the cost of an  Because a If you say that you acknowledge that this is going to be a shared burden and this is something that is going to allow the government to make sure that the ocean has enough fish for everybody. I guess I'm just back to not Because it's a regulatory burden that is in the statute. But a net is a particular kind of   And that's a regulatory burden that's in the  Thou shalt have these nets. That's in the  Thou shalt have these observers. There are costs associated with that. You know what they are? Having a berth. And that's why the statute says if you don't have room for observers, you don't have to have them. So certain boats don't have anything. But that's in the statute. That's not made up after 20 years of thinking about it by the administrative agencies. The regulatory cost of having an observer on your boat is making the room and making sure you have enough food, although the government pays for the food of observers, not for the SMs. So you have to do all the things to have a person around and you have to have a space on your boat for them to do your job. Those are regulatory costs. We understand those. We can read the statute and say that's a regulatory cost. But paying somebody to watch you is not a  cost. And again, I've challenged the Justice Department, I've challenged my associates and everyone else, find a case in this highly regulated world anywhere where the watchers are paid for by the industry without Congress saying so explicitly. I haven't found a case. Not in all the years I've been doing this. Justice Department has never brought it up. Somehow it only happens here in New England and in the fisheries by this idea that Congress delegated everything. It didn't delegate its ability to say who pays. And if you use the canons, if you look at the statute of where they do say who pays and it's us, it means that where they didn't say it's us, it's not us. Thank you, Your Honors. If you have no further questions. That concludes argument in this case.